## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

EUGENE SCALIA, Secretary of Labor,     :     Case No.  1:17-cv-203
United States Department of Labor,     :
                                       :     Judge Michael R. Barrett
      Plaintiff,                       :
                                       :
v.                                     :
                                       :
G.E.M. INTERIORS, INC., *et. al.*,     :
                                       :
      Defendants.                      :
                                       :

     This matter is before the Court on Defendants Gem Interiors, Inc., Melissa Hayes, Gregory E Massie, Lisa Pack's Motion for Summary Judgment (Doc. 45); Plaintiff Department of Labor Secretary's Motion for Summary Judgment (Doc. 49); Defendants' Motion to Strike the Declaration of Steve Michael (Doc. 54); Defendants' Motion to Strike Declaration and Exhibit of Wage and Hour Division Investigator Nikolai Bogomolov (Doc. 55); and Defendants' Motion to Strike the Declarations of Unidentified Employee Witnesses (Doc. 63).

## I.    BACKGROUND

     Plaintiff Department of Labor Secretary ("Secretary") claims that between March 27, 2014 and the present, Defendants have violated the overtime provisions of the Fair Labor Standards Act ("FLSA") by misclassifying employees, failing to pay for all overtime hours worked, paying for overtime hours through side payments at rates less than the overtime premium rate, and giving employees paid time off, rather than overtime wages.

     Defendant G.E.M. Interiors, Inc. performs construction work, including commercial drywall installation; metal stud framing; acoustic ceilings installation; doors and hardware installation; exterior insulation finishing systems ("EIFS"); and siding and windows

installation.  (Doc. 36, ¶ 3).  Defendants Greg Massie, Missy Hayes and Lisa Pack are all partial owners of G.E.M. (Id. ¶¶11-13).

In addition to office staff, G.E.M. employs foremen, carpenters, drywall finishers, and laborers.  (Id. ¶ 6).  G.E.M. typically assigns and places a foreman, employed by G.E.M. as a payroll employee, at each jobsite. (Id. ¶ 7).  G.E.M. foremen are responsible for ensuring the job is done on schedule, the work is done safely, and the job is run correctly.  (Id. ¶ 8).  If additional workers are needed on a jobsite, G.E.M. relies on subcontractors. (Id. ¶¶ 21, 22).  The Secretary maintains these additional workers—who the Secretary refers to as "Crew Leaders," "Crew Members" and "Alleged Subcontractors"—are not subcontractors, but instead are properly classified as employees under the FLSA; and as employees, they are entitled to overtime under the FLSA.  In addition, the Secretary maintains that Defendants have violated the FLSA by failing to pay overtime wages to workers they admit are their employees.  The Secretary argues that given Defendants' prior history of violating the FLSA, the Court should find these violations are willful.   However, Defendants deny liability for the payment of overtime wages to their employees, or the workers they refer to as "Labor Providers" or "subcontractors."[1]  Both the Secretary and Defendants claim they are entitled to summary judgment on the Secretary's claims.

## II.  ANALYSIS

### A.  Summary judgment standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[1]For the sake of convenience, the Court will refer to the workers at issue as "Subcontractors."

Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding whether this burden has been met by the movant, this Court views the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). These standards upon which motions for summary judgment are evaluated do not change when, as here, "both parties seek to resolve [the] case through the vehicle of cross-motions for summary judgment." *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir.1991). As the Sixth Circuit has explained:

> "[t]he fact that both parties make motions for summary judgment ... does not require the Court to rule that no fact issue exists." *Begnaud v. White*, 170 F.2d 323, 327 (6th Cir. 1948)(cited with approval in *Cherokee Ins. Co. v. E.W. Blanch Co.*, 66 F.3d 117, 122 n. 4 (6th Cir. 1995)).

*B.F.Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 592-93 (6th Cir. 2001). Instead, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Taft Broadcasting*, 929 F.2d at 248.

### B. Motions to Strike

Federal Rule of Civil Procedure 56(c)(2), as amended in 2010, governs the procedure by which courts must review objections to the admissibility of evidence presented in connection with a motion for summary judgment. *Smith v. Interim HealthCare of Cincinnati, Inc.*, No. 1:10-cv-582, 2011 WL 6012971, at *4 (S.D. Ohio Dec. 2, 2011). A party moving for (or opposing) summary judgment may cite to materials in the record, including depositions, documents, affidavits or declarations, and admissions.

Fed. R. Civ. P. 56(c)(1)(A). If a party believes that the material cited to support (or dispute) a fact "cannot be presented in a form that would be admissible in evidence[,]" that party may file an objection. Fed. R. Civ. P. 56(c)(2). Motions to strike, then, are no longer appropriate. *Smith*, 2011 WL 6012971, at *4 ("The objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated. There is no need to make a separate motion to strike.") (emphasis added)) (citing Fed. R. Civ. P. 56 advisory committee's notes (2010 Amendment)); s*ee also Erwin v. Village of Morrow*, No. 1:16-cv-1166, 2019 WL 1495921, at *1 (S.D. Ohio Apr. 4, 2019). "If a party does file a separate motion to strike, the motion should be construed as an objection under Rule 56(c)(2)." *Stillwagon v. City of Delaware*, 274 F. Supp. 714, 737 (S.D. Ohio 2017) (citing *Smith*, 2011 WL 6012971, at *4). Accordingly, the Court will construe Defendants' motions to strike as objections under Rule 56(c)(2).

### 1. Steve Michael Declaration and Exhibits

Defendants' first objection is to the declaration of Steve Michael and the exhibits attached to his declaration (Doc. 47-1). Michael is a former G.E.M. foreman. (Doc. 47-1, ¶ 2, PAGEID 5476). Defendants maintain that Michael's statements constitute legal conclusions, are based on hearsay and other inadmissible evidence, and are more prejudicial than probative. Defendants also object to the exhibits attached to Michael's declaration because they are unauthenticated, unverified and not made based on the declarant's personal knowledge. In the alternative, Defendants argue that the Court must strike portions of the exhibits which constitute inadmissible hearsay, lack relevance, are inadmissible and/or prejudicial.

4

Federal Rule of Civil Procedure 56(c)(4) provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on matters stated." Fed. R. Civ. P. 56(c)(4). Accordingly, a party "cannot use hearsay or other inadmissible evidence to create a genuine issue of material fact." *Sperle v. Michigan Dep't of Corr.*, 297 F.3d 483, 495 (6th Cir. 2002).

Defendants argue that the timesheets and time records attached as Exhibits A through C to Michael's Declaration have not been authenticated and do not qualify as self-authenticating business records.

On a motion for summary judgment, a district court should not consider documents which are not authenticated. *Magnum Towing & Recovery v. City of Toledo*, 287 Fed.Appx. 442, 448 (6th Cir. 2008) (citations omitted). A business record is self-authenticating under Federal Rule of Evidence 803(6) if it meets the following four requirements:

> (1) it must have been made in the course of a regularly conducted business activity; (2) it must have been kept in the regular course of that business; (3) the regular practice of that business must have been to have made the memorandum; and (4) the memorandum must have been made by a person with knowledge of the transaction or from information transmitted by a person with knowledge.

*Fambrough v. Wal-Mart Stores, Inc.*, 611 F. App'x 322, 326 (6th Cir. 2015) (quoting *Cobbins v. Tenn. Dep't of Transp.*, 566 F.3d 582, 588 (6th Cir. 2009)). These conditions must be shown "by the testimony of the custodian or another qualified witness." Fed. R. Evid. 803(6). However, as the Sixth Circuit has explained:

> "Rule 803(6) does not require that the custodian personally gather, input, and compile the information memorialized in a business record." *Weinstock*, 153 F.3d at 276. The custodian of the records need not be in

control of or have individual knowledge of the particular corporate records, but need only be familiar with the company's recordkeeping practices. *Id.* (citing *In re Custodian of Records of Variety Distrib., Inc.*, 927 F.2d 244, 248 (6th Cir.1991)).  Likewise, "[t]o be an 'other qualified witness,' it is not necessary that the person laying the foundation for the introduction of the business record have personal knowledge of their preparation." *Dyno Construction Co. v. McWane, Inc.*, 198 F.3d 567, 575–76 (6th Cir. 1999).

*United States v. Jenkins*, 345 F.3d 928, 935-36 (6th Cir. 2003) (quoting *United States v. Salgado*, 250 F.3d 438, 451-52 (6th Cir. 2001).

In his declaration, Michael states that the timesheets in Exhibit A are copies of timesheets he created as a G.E.M. foreman.  (Doc. 47-1, Michael Decl. ¶ 5).  Michael explains that he would sometimes take a photograph of the timesheets and text them to Lisa Pack, who is a member of G.E.M.'s management.  Michael states that the timesheets in Exhibits B and C were created either by him or another G.E.M. employee and then texted to a member of G.E.M.'s management.  (Doc. 47-1, Michael Decl. ¶ 7).  Michael explains that Exhibits A, B and C were made on a weekly basis with knowledge of the hours worked by his crew, and were kept in the course of his regular activity as a G.E.M. foreman.  (Doc. 47-1, Michael Decl. ¶ 8).  Michael states that the records in Exhibit D were created by him to track his own overtime hours and the overtime hours of another employee.  (Doc. 47-1, Michael Decl. ¶ 9).  Michael explains that these records were made on a weekly basis, and were based on his knowledge of the hours worked by himself and the other employee.  (Doc. 47-1, Michael Decl. ¶ 10).  Michael states that making the records was a regular practice of his activity as a G.E.M. foreman.  (Id.)

Based on his Declaration, the Court concludes that Michael is an "other qualified witness."  Michael states that the timesheets in Exhibits A, B, and C were either made by him—a person with knowledge of the transaction—or were based on information from his

6

crew—who are people with knowledge. In addition, Michael states—albeit somewhat generically—that the timesheets were made and kept in the course of a regularly conducted business activity (presumably to prepare paychecks for his crew). Therefore, with regard to authenticity, the Court will consider Exhibits A, B, and C in support of the Secretary's motion for summary judgment.

However, the Court's ruling with regard to Exhibit D is different. While "Rule 803(6) does not require that the document actually be prepared by the business entity proffering the document," the affiant must demonstrate that the incorporating business relies upon the accuracy of the document incorporated and that there are "other circumstances indicating the trustworthiness of the document." *Air Land Forwarders, Inc. v. United States*, 172 F.3d 1338, 1343 (Fed.Cir.1999). Michael does not state that he is familiar with G.E.M.'s recordkeeping practices. Michael also does not state that his records were sent to anyone at G.E.M. or that G.E.M. relied upon the information in Exhibit D. Defendant Lisa Pack testified that she could not explain why Michael's records did not match G.E.M.'s records. (Doc. 44-3, Lisa Pack Depo. at 146-47). Therefore, the Court will not consider Exhibit D in support of the Secretary's motion for summary judgment.

Defendants also argue that Exhibit F to Michael's Declaration—a spreadsheet listing text messages Michael sent or received—has not been authenticated and contains hearsay. While Michael did not create the spreadsheet, he explains that he provided two of his cell phones to the Department of Labor, and the spreadsheets list "some of the text messages" from his phone. (Doc. 47-1, Michael Decl. ¶ 13.) Michael states he reviewed the spreadsheets and they are a true and accurate description or summary of text messages he sent or received. (Id.) Federal Rule of Evidence 901(b)(4) provides that

records may be authenticated by the introduction of testimony regarding their unique characteristics: *i.e.*, the "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." Fed. R. Evid. 901(b)(4). As a recipient or sender of the text messages, Michael would be able to properly authenticate the text messages. Therefore, the Court will consider the spreadsheet of text messages even though the document has not yet been authenticated. *Accord Moore v. Baptist Mem'l Coll. of Health Scis.*, No. 08-2311 MA/P, 2010 WL 100551, at *6 (W.D. Tenn. Jan. 7, 2010) (explaining that "some courts have nevertheless considered unauthenticated documents in deciding a motion for summary judgment where the objecting party simply argued that the proponent of the documents failed to properly authenticate the documents, as opposed to challenging the authenticity of the documents."). However, "[h]earsay evidence may not be considered on summary judgment." *Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir. 1999). To the extent that the text messages contain hearsay for which there is no exception, the Court will not consider these statements in support of the Secretary's motion for summary judgment.

Similarly, "[i]t is well settled that courts should disregard conclusions of law (or 'ultimate fact') found in affidavits" submitted for summary judgment. *Harrah's Ent., Inc. v. Ace Am. Ins. Co.*, 100 F. App'x 387, 394 (6th Cir. 2004) (quoting *F.R.C. Int'l, Inc. v. United States*, 278 F.3d 641, 643 (6th Cir. 2002)). Therefore, to the extent that the Michael Declaration contains conclusions of law, the Court will not consider those statements, and will make its own determination with regard to the legal issues presented. *Accord Carl Kelley Constr. LLC v. WTNM Tech., Ltd.*, No. CIV 08–0379 JB/RLP, 2009 WL 1312904,

at *1 (D.N.M. Jan. 5, 2009) ("Certain aspects of the challenged paragraphs can be understood as making legal conclusions. The Court does not need to strike the affidavit, however, because the affidavit contains legal conclusions. The Court will come to its own determination of the legal issues involved in this case.").

Therefore, Defendants' Motion to Strike the Declaration of Steve Michael (Doc. 54) is OVERRULED in PART and SUSTAINED in PART.

### 2. Declaration of Nikolai Bogomolov and exhibit

Defendants also object to the Declaration of Wage and Hour Division Investigator Nikolai Bogomolov and the exhibit which is attached to his declaration. (Docs. 46-1, 48). Defendants argue that Bogomolev's declaration and the exhibit do not conform to the requirements dictated by Civil Rule 56(c)(2) and the Federal Rules of Evidence.

With regard to the exhibit attached to Bogomolov's declaration—an Investigative Report from a 2011 Department of Labor investigation of G.E.M—Defendants argue that even if the document can be authenticated, the 2011 Investigative Report contains hearsay, or hearsay within hearsay, and should therefore be excluded. Defendants also object to Bogomolev's statements in his Declaration based on the 2011 investigation since he has no personal knowledge of the investigation. The Secretary responds that the 2011 Report is admissible under Federal Rule of Evidence 803(8).

Under Rule 803(8), the following are not excluded by the rule against hearsay:

> A record or statement of a public office if (A) it sets out ... (iii) in civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and (B) the opponent does not show that the source of information or other circumstances indicate lack of trustworthiness.

Fed. R. Evid. 803(8). The Supreme Court has held that Rule 803(8) allows for the admission of reports containing opinions and conclusions, as well as facts. *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169-170, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988) ("As long as the conclusion is based on a factual investigation and satisfies the Rule's trustworthiness requirement, it should be admissible along with other portions of the report."). "The 'factual findings' in a report qualifying for a Rule 803(8)[ ] exception to the hearsay rule must, however, be based upon the knowledge or observations of the preparer of the report." *Miller v. Field*, 35 F.3d 1088, 1091 (6th Cir.1994). "[F]actual findings, which are based on inadmissible hearsay, are not admissible under Rule 803(8)[ ] because the underlying information is untrustworthy." *Id*. (quoting *Complaint of Paducah Towing Co., Inc. (United States v. Paducah Towing Co., Inc.)*, 692 F.2d 412, 420–21 (6th Cir.1982). Accordingly, the Court finds that the 2011 Investigative Report falls within the hearsay exception set forth in Rule 803(8). However, the Court will disregard internal hearsay statements in the Report and only rely upon facts observed by the investigator who made the Report.

Defendants also object to the 2011 Investigative Report to the extent that the Report includes settlement discussions in separate matter where Defendants were unrepresented.

Federal Rule of Evidence 408 provides that certain evidence pertaining to settlement negotiations is not admissible "either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction." Fed. R. Evid. 408. As the Sixth Circuit has explained:

> Rule 408 serves three purposes. First, the rule promotes the "resolution of disputes short of litigation, thereby conserving scarce judicial resources.

The rule recognizes that settlements are more likely to result when parties are free to speak openly during settlement negotiations, without fear that what is said can be used against them at trial." *Korn, Womack, Stern & Assocs. v. Fireman's Fund Ins. Co.*, 27 F.3d 566, 1994 WL 264263, at *6 (6th Cir. June 15, 1994). Second, the rule seeks to exclude irrelevant evidence, recognizing that "disputes are often settled for reasons having nothing to do with the merits of a claim." *Ibid*. Third, the rule attempts to exclude unreliable evidence, as settlement negotiations "are typically punctuated with numerous instances of puffing and posturing," and "[w]hat is stated as fact on the record could very well not be the sort of evidence which the parties would otherwise contend to be wholly true." *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976, 981 (6th Cir. 2003) (quoting *Cook v. Yellow Freight System, Inc.*, 132 F.R.D. 548, 554 (E.D.Cal. 1990)).

*Eid v. Saint-Gobain Abrasives, Inc.*, 377 F. App'x 438, 444 (6th Cir. 2010).

However, courts have admitted evidence of settlement negotiations for purposes other than the validity or amount of a disputed claim. For example, in actions to enforce the terms of a settlement agreement, courts have found evidence of settlement negotiations admissible to prove the existence and terms of the settlement agreement itself. *Seymour v. Renaissance Healthcare Group, LLC*, No. 3:14-CV-144, 2015 WL 1458049, at *4 (E.D. Tenn. March 30, 2015) (citing cases). Courts have also permitted evidence of settlement agreements to prove a party's knowledge of a legal obligation, notice, or concealment to avoid a legal obligation. *In re: General Motors LLC Ignition Switch Litigation*, 14-MD-2543, 2015 WL 7769524, at *3 (S.D.N.Y. Nov. 30, 2015) ("Thus, while Plaintiff may not introduce evidence of the settlements to prove that the claims were meritorious (or make any arguments to that effect), he may introduce evidence for other purposes — for example, to show that New GM was on notice of the ignition switch defect long before Plaintiff's accident, to show that New GM took steps to conceal evidence of the ignition switch defect, or to rebut New GM's apparent argument that its legal department was appropriately structured to respond to defect to reports of defects.");

*Saccameno v. Ocwen Loan Servicing, LLC*, No. 15 C 1164, 2018 WL 10609658, at *2 (N.D. Ill. Apr. 2, 2018) (permitting evidence of a consent judgment to show defendant's "going-forward obligations and its awareness of problems with its loan servicing practices, not to prove or disprove the validity of a disputed claim."). However, courts have not permitted proof of settlement information from previous actions to establish liability for punitive damages. *See Doe v. Aramark Educ. Res., Inc.*, 206 F.R.D. 459, 464 (M.D. Tenn. 2002) ("Undoubtedly, Plaintiffs will have the opportunity to offer proof of notice, continuing pattern of conduct, negligent supervision, and negligent hiring by means far less offensive to the policies behind Rule 408 . . . and by means far less prejudicial to Defendant."); *Steede v. Gen. Motors LLC*, No. 2:11-CV-02351-STA, 2012 WL 5305800, at *3 (W.D. Tenn. Apr. 3, 2012), aff'd, No. 11-2351-STA-DKV, 2012 WL 2089755 (W.D. Tenn. June 8, 2012) ("The theory which Steede advances to compel disclosure of this settlement information appears to be inadmissible because it uses GM's previous settlements to establish liability for punitive damages. Any argument made by Steede for punitive damages involving an economic impact calculation based solely on GM's actual settlement amounts would violate Rule 408."); *see also Bridgeport Music, Inc. v. Justin Combs Pub.*, 507 F.3d 470, 480 (6th Cir. 2007) (concluding that "district court properly precluded defendants from offering as evidence, during the liability phase of the trial, defendants' post-litigation settlement offers, which defendants argue constitute evidence that they did not infringe willfully."). Therefore, the Court will permit evidence of previous settlement negotiations, but only to the extent that they are considered as evidence of Defendants' knowledge on certain issues.

Defendants also object to Bogomolev's statements in his Declaration based on the 2015 investigation because those statements are hearsay. "A declaration or an affidavit offered in support of a motion for summary judgment must set forth specific facts (not conclusory statements) made on the basis of personal knowledge." *Enigwe v. Diversity City Media*, 2008 WL 11352583, at *2 (S.D. Ohio June 2, 2008). Accordingly, the Court will ignore any statements which are not made based on Bogomolev's personal knowledge.

Therefore, Defendants' Motion to Strike Declaration and Exhibit of Wage and Hour Division Investigator Nikolai Bogomolov (Doc. 55) is OVERRULED in PART and SUSTAINED in PART.

### 3. Declarations of unidentified employees

Finally, Defendants object to the declarations of unidentified employees labeled as Employee 1, Employee 2, Employee 3, Employee 4, Employee 5, and Employee 6 which the Secretary has provided in response to Defendants' Motion for Summary Judgment. (Doc. 63). Defendants maintain that the Secretary impermissibly relies on the informer's privilege to conceal the identities and other identifying information of the employees, including dates of employment.

"Although usually referred to as the informer's privilege, the privilege is in reality the government's privilege to withhold from disclosure certain information." *United States v. Sharp*, 778 F.2d 1182, 1185, n.1 (6th Cir. 1985) (citing *Roviaro v. United States*, 353 U.S. 53, 59, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957)). As the Supreme Court has explained:

> The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of

13

crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation.

*Roviaro*, 353 U.S. 53, 59 (footnotes omitted). The informer's privilege "is recognized in FLSA cases, where enforcement is dependent on the cooperation and statements given by employees." *Acosta v. Five Star Automatic Fire Prot., LLC*, No. EP-16-CV-282-PRM, 2017 WL 10604137, at *2 (W.D. Tex. May 30, 2017) (collecting cases). Courts, including the Sixth Circuit, have applied the privilege to present as well as former employees. *Martin v. New York City Transit Auth.*, 148 F.R.D. 56, 63 (E.D.N.Y. 1993) (collecting cases); *Dunlop v. Carriage Carpet Co.*, 548 F.2d 139, 146 (6th Cir. 1977) ("[t]here is no ground for affording any less protection to defendant's former employees than to its present employees."). However, the privilege is not absolute:

> The scope of the privilege is limited by its underlying purpose. Thus, where the disclosure of the contents of a communication will not tend to reveal the identity of an informer, the contents are not privileged. Likewise, once the identity of the informer has been disclosed to those who would have cause to resent the communication, the privilege is no longer applicable.
>
> A further limitation on the applicability of the privilege arises from the fundamental requirements of fairness. Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way.

*Roviaro*, 353 U.S. 53, 60-61 (footnotes omitted). Generally, in questions involving the privilege, "the interests to be balanced ... are the public's interest in efficient enforcement of the Act, the informer's right to be protected against possible retaliation, and the defendant's need to prepare for trial." *Solis v. Delta Oil Co.*, No. 1:11-CV-233, 2012 WL 1680101, at *3 (S.D. Ohio May 14, 2012) (quoting *Hodgson v. Charles Martin Inspectors of Petroleum, Inc.*, 459 F.2d 303, 305 (5th Cir.1972)). Once invoked by the government, the opposing party bears the burden of showing a compelling need for the information

sufficient to overcome the privilege. *Id*. (citing *United States v. Sanchez*, 908 F.2d 1443, 1451 (9th Cir. 1990)).

In *Solis v. Delta Oil Co., Inc*., this Court concluded that the government's interest in protecting the identities of the informants who were interviewed by the DOL investigator outweighed the defendants' need for such information at the discovery stage of the litigation. 2012 WL 1680101, at *5. This Court noted that the Secretary had already disclosed the names of the defendants' employees who the Secretary claimed were not properly paid under the FLSA. *Id*. at *4. This Court also noted, that as the owners and operators of the gas stations, the defendants had knowledge of the hours worked, number of days worked each week, method of compensation, and whether they crated and maintained proper records. *Id*. Therefore, the Court did not order the Secretary to identify those individuals who provided statements to the DOL during the investigations. *Id*. at *5.

Here, Defendants maintain that the Secretary has redacted all dates, there is no specific job site information, or other information Defendants could use, in conjunction with employee records and the Complaint, to readily identify these individuals.

The Court notes that unlike *Solis v. Delta Oil Co., Inc*., this case is no longer at the discovery stage. Courts "contemplate that the privilege will be lost once the informant/informer provides sworn testimony, either by way of an affidavit or declaration in support of a motion for summary judgment, or as a witness at trial." *Perez v. Los Arcos Seafood & Grill, Inc*., No. 3:12-CV-01133, 2016 WL 1029519, at *7 (M.D. Tenn. Mar. 9, 2016); *Perez v. Am. Future Sys., Inc*., No. CIV.A. 12-6171, 2013 WL 5728674, at *5 (E.D. Pa. Oct. 21, 2013). However, the Court also notes that the information provided in the declarations of unidentified employees is largely cumulative of information already in the

record. Furthermore, Defendants themselves reference the declarations of the unidentified employees in their Reply in Support of their Motion for Summary Judgment. (Doc, 65, PAGEID 6772) ("Even the Secretary's witnesses confirm multiple contractors would be working for G.E.M. at the same time. (Doc. 57-1, Pg. 6383, ¶ 23 (witnessing "other independent contractors"); Doc. 57-2, 57-3, 57-4 (redacted statements different subcontractors).").  The Court concludes that under the circumstances, the Court need not determine whether the Secretary properly invoked the informer's privilege in order to make its determination regarding summary judgment.  If this case proceeds to trial and the Secretary continues to invoke the informer's privilege, the Court will then revisit the merits of Defendants' objection.

Therefore, Defendants' Motion to Strike the Declarations of Unidentified Employee Witnesses (Doc. 63) is OVERRULED as MOOT.

## C. **FLSA**

The FLSA requires employers to pay certain minimum wages and overtime to employees "engaged in commerce or in the production of goods for commerce." 29 U.S.C. §§ 206(a), 207(a)(1).  The Secretary claims that Defendants violated the FLSA by (1) misclassifying workers as independent contractors instead of employees; (2) implementing schemes to avoid paying overtime wages to workers they admit are G.E.M.'s employees; and (3) failing to maintain accurate records.  The Secretary claims that Defendants' violations are willful.  The Secretary also claims that Defendants Massie, Hayes, and Pack are employers under Section 203(d) of the FLSA and, therefore, are jointly and severally liable for any FLSA violations found by the Court.  The Secretary has moved for summary judgment on all of its claims.  Defendants have only moved for

summary judgment on the Secretary's claim that Defendants have violated the FLSA by misclassifying workers as independent contractors.

### 1. Misclassifying workers

The definition of "employee" under the statute "is strikingly broad" and includes "some parties who might not qualify as such under a strict application of traditional agency law principles." *Acosta v. Off Duty Police Servs., Inc*., 915 F.3d 1050, 1055 (6th Cir. 2019) (quoting *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 804 (6th Cir. 2015)). However, only employees are entitled to overtime and minimum-wage compensation under the FLSA. *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 806 (6th Cir. 2015) (citing *Ellington v. City of E. Cleveland*, 689 F.3d 549, 553 (6th Cir. 2012)). Independent contractors do not enjoy FLSA's protections. *Id*. (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947)).

"When determining whether workers are employees under the FLSA, the Court must look beyond mere labels and contractual agreements." *Doucette v. DIRECTV, Inc*., 2:14-cv-02800, 2015 WL 2373271, at *2 (W.D. Tenn. May 18, 2015).[2] Instead, "in distinguishing between employees and independent contractors, courts have focused on whether, as a matter of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself." *Solis v. Laurelbrook Sanitarium & Sch., Inc*., 642 F.3d 518, 523 (6th Cir. 2011) (internal quotations omitted); *see also Donovan v. Brandel*, 736 F.2d 1114, 1116 (6th Cir. 1984) (explaining that "employees are

---

[2]Accordingly, the Court gives little weight to Defendants' argument that in the "Independent Contractor Agreements" between GEM and the Crew Leaders and Crew Members, the Crew Leaders and Crew Members expressly agreed to their classification as independent contractors.

17

those who as a matter of economic reality are dependent upon the business to which they render service.").  This "economic reality" test considers six factors:

> "1) the permanency of the relationship between the parties; 2) the degree of skill required for the rendering of the services; 3) the worker's investment in equipment or materials for the task; 4) the worker's opportunity for profit or loss, depending upon his skill; ... 5) the degree of the alleged employer's right to control the manner in which the work is performed ...;" and 6) "whether the service rendered is an integral part of the alleged employer's business."

*Off Duty Police Servs.*, 915 F.3d at 1055 (quoting *Keller*, 781 F.3d at 807).  Other factors to consider are whether the business had "authority to hire or fire the plaintiff;" and whether the defendant-company "maintains the plaintiff's employment records." *Keller*, 781 F.3d at 807 (quoting *Ellington*, 689 F.3d at 555).  No one factor is determinative.  *Id*. Whether a worker is an employee under the FLSA is a mixed question of law and fact. *Id.* at 806.

The Secretary maintains that the Subcontractors are economically dependent on G.E.M.[3]  Defendants disagree, and claim that there is insufficient evidence to show they are the "employer" of any these workers.

### a.  Permanency of the relationship

This factor looks to the "length and regularity of the working relationship between the parties." *Keller*, 781 F.3d at 807 (citation omitted).  "Generally, independent contractors have variable or impermanent working relationships with the principal company because they 'often have fixed employment periods and transfer from place to

---

[3]The Secretary focused on seven Subcontractors: Assured Construction Services, LLC/Ben Wethington Co., A-1 Labor Source, Melbin Sosa Cabrera and/or 3MSS, LLC, Orlando Santiago Nieves and/or OS Interiors, LLC, Justino Rios, Manuel Hernandez and/or HGM Drywall, LLC, Leovardo Garcia Santiago and/or LGS Interiors, LLC, Luis Rosas, and Gerardo Padilla aka Amazing Interiors.

place as particular work is offered to them, whereas 'employees' usually work for only one employer and such relationship is continuous and indefinite in duration.'" *Id.* (quoting *Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1442 (10th Cir.1998)).

Defendants argue that there is no evidence that any of the Subcontractors worked exclusively or on a regular basis for Defendants. However, "employees may work for more than one employer without losing their benefits under the FLSA." *Keller*, 781 F.3d 799, 808 (quoting *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1060 (2d Cir. 1988)). While schedule variability can serve as an indicator of independent-contractor status, "workers have been deemed employees where the lack of permanence is due to operational characteristics intrinsic to the industry rather than to the workers' own business initiative." *Id.* (quoting *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1060 (2d Cir. 1988)). Therefore, "short, exclusive relationships between the worker and the company may be indicative of an employee-employer relationship." *Id.* at 807 (6th Cir. 2015) (citing *Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1537 (7th Cir.1987) ("[H]owever temporary the relationship may be [between migrant workers and farm owner,] it is permanent and exclusive for the duration of that harvest season."); *but see Brandel*, 736 F.2d at 1117 (evidence in the record showed that the annual return of migrant families to the defendant's fields was a product of a mutually satisfactory arrangement rather than the permanent relationship between them). As the Sixth Circuit has explained in a case involving officers who provided private security and traffic control services:

> whether a worker has more than one source of income says little about that worker's employment status. . . . To the extent that a worker's source of income is relevant, it is only so because it speaks indirectly to the question of whether the individual works for more than one company. As we recognized in *Keller*, however, that an individual works for more than one company is only one consideration of many to make "in determining whether

> a worker is economically dependent upon the defendant company." 781
> F.3d at 808. Further, this fact is most relevant when it suggests that a
> worker tends to "transfer from place to place as particular work is offered to
> [him]." *Id.* at 807 (citation omitted). In this case, the sworn officers did not
> bounce from one company to another in search of new work. Although
> some officers testified that they occasionally accepted jobs from other
> companies, the consistent theme throughout trial was that the officers had
> two primary sources of employment—their day jobs and their positions at
> ODPS. That is not the kind of itinerant work that independent contractors
> ordinarily perform. Given the length and consistency of the relationship
> between ODPS and its workers, the permanence factor supports employee
> status for both sworn and nonsworn workers.

*Off Duty Police Servs.,* 915 F.3d at 1058-59.

Here, Defendant Massie, who serves as G.E.M.'s project manager, testified that

Defendants did not hire Subcontractors for every job site. (Doc. 38, Greg Massie Dep.

65, PAGEID 239). Massie explained that Defendants used Subcontractors because it

was difficult to hire employees due to the nature of the work:

> it is just very hard to hire -- one day hire 20 people and the next day lay off
> 20 people, because we only need that for one day. We have tried. We
> have put ads in the paper. People don't want to hang drywall anymore.
> They want to do the easy jobs. It's a very, very hard job. And we just can't
> hire and find, in one day, 20 men.

(Id. at 106-107, PAGEID 280-281). Therefore, after G.E.M. was awarded a job with a

general contractor, G.E.M. would start the job with one or two people, then add more

people as the job progressed. (Doc. 44-1, GEM Dep. at 145, PAGEID 4891). The number

of workers G.E.M. needed was dictated by the general contractor's schedule:

> So if we have to have a certain X amount done in X amount of time, and we
> have two employees available because everybody else is on another job
> site, then we subsidize the workforce.
>
> And at the time that it happens, you just kind of call the companies that
> you're used to working with, or if somebody new has come in off the street,
> you know.

20

(Doc. 44-1, GEM Dep. at 145-46, PAGEID 4891-92). Massie testified that he would find workers for new jobs by "[w]ord of mouth. . . . They're always looking for work." (Doc. 38, Massie Dep. at 59, PAGEID 233).

Some of the Subcontractors—Ben Wethington, Tracey Barger, Antonio Ramirez, Orlando Santiago Nieves, and Justino Rios—started out as G.E.M. employees and then became Subcontractors. (Doc. 50-6). Tracey Barger testified that her company, A-1 Labor Source, worked for someone other than G.E.M. on only one occasion. (Doc. 41, Tracey Barger Dep. at 48-49, PAGEID 816-17). Ben Wethington testified that his company, Assured Construction Services, did work for other companies after his first year of operations. (Doc. 43, Ben Wethington Dep. at 308, PAGEID 1569). However, records show that after that first year, Wethington's work for G.E.M. still comprised of 61-75% of his business. (Doc. 50-9).

As far as the workers he used for each job, Wethington explained that he acted as a "middleman for all the people that wanted to work as a subcontractor." (Doc. 43, Wethington Dep. at 278, PAGEID 1539). Wethington stated that he "tried to make sure they always had something to do" because "[i]f I couldn't find them any work . . . the first thing they did was call those other bosses to see if they needed them anywhere. So that's the reason I would always try to keep them busy because they'll jump ship and go somewhere else in a heartbeat." (Doc. 43, Wethington Dep. at 297-98, PAGEID 1556-57). Similarly, Michael Huber, who works as a foreman for G.E.M., was asked whether he tended to work with the same people or it changes:

> No, a lot of the same people. You know, you can't always get the same, but through the years, you'll see people you haven't seen in a couple years, they'll show up, you know. It changes a lot.

21

(Doc. 44-2, Michael Huber Dep. at 22-23, PAGEID 4969-4970).

While there is evidence indicating that some of the Subcontractors had a permanent relationship with Defendants, reasonable minds could differ as to whether this factor leans in favor of a finding that Subcontractors were employees rather than independent contractors.  Therefore, this factor does not support either side's contention that there is an absence of a genuine issue as to the Subcontractors' employment status.

### b.  Degree of skill required

"This factor assesses the complexity of the work performed, how the worker acquired their skill, and the length of the worker's training period.  *Gilbo v. Agment, LLC*, 831 F. App'x 772, 776 (6th Cir. 2020) (citing *Off Duty Police Servs.*, 915 F.3d at 1055–56; *Keller*, 781 F.3d at 809).  As the Sixth Circuit has explained:

> Skills are not the monopoly of independent contractors." *Lauritzen*, 835 F.2d at 1537.  More important to our inquiry is whether [the worker's] profits increased because of the "initiative, judgment[,] or foresight of the typical independent contractor," or whether his work "was more like piecework." *Rutherford*, 331 U.S. at 730, 67 S.Ct. 1473.

*Keller*, 781 F.3d at 809.  It is also important how the worker acquired his skill:

> If a worker learned his craft through formal education, an apprenticeship, or years of experience, then it is more likely that the worker's compensation varies with his unique skill and talent.  On the other hand, if the worker's training period is short, or the company provides all workers with the skills necessary to perform the job, then that weighs in favor of finding that the worker is indistinguishable from an employee.

*Id*.

There is evidence in the record which indicates that Defendants did not hire Subcontractors based on specialized skills.  Instead, G.E.M. would hire Subcontractors and "try them out."  (Doc. 38, Massie Dep. at 146, PAGEID 320).  As G.E.M.'s corporate representative testified:

22

> Q: . . . when somebody comes in and indicates, like you said, they give their name, what pay rate they're looking for, that kind of thing.  By merely giving you that information, does that automatically mean that they are going to be able to work on a G.E.M. project? Or is there some kind of vetting that has to happen?
>
> A: Really, no, it's drywall, we don't vet. If a guy comes to a job site and Bill needs help or Joe Blow needs help, or Shmoe and they . . . talk to the kid or, talk to the person and negotiate it before they even come to the office. And then the foreman will come and say hey, we just hired Joe Shmoe.

(Doc. 44-1, GEM Dep. at 70, PAGEID 4816).  Wethington also explained that special skills are not necessary:

> Q: . . . To do the type of work that Assured does, do you need any kind of special training or skills?
>
> A: Special training[?]
>
> Q: Yes.
>
> A: No, you can take just about anybody and put him with a good carpenter and over the course of a month he should be able to pick up just about anything that needs done.

(Doc. 43, Wethington Dep. at 142, PAGEID 1403).  Wethington also explained that even with drywall finishing, a new worker could complete the bulk of the work, "but it wouldn't be – it wouldn't look as well as somebody that's been doing it for, you know, four years or something like that.  And it surely wouldn't move as fast."  (Doc. 43, Wethington Dep. 303. PAGEID 1564).

Therefore, it is clear from the record that no special skills were required for the work being performed by the Subcontractors.  Any period of time spent training was short, and either G.E.M. or Wethington provided Subcontractors with the skills necessary to perform the job.  Moreover, the record suggests that Defendants did not select Subcontractors based on their skills, but whether they were available.  This evidence

weighs in favor of finding that Subcontractors are indistinguishable from employees. *Accord Keller*, 781 F.3d at 809. Therefore, this factor does support the Secretary's contention that there is an absence of a genuine issue as to the Subcontractors' employment status.

### c. Worker's investment in equipment or materials

"This factor compares the worker's total investment in the company to 'the company's total investment, including office rental space, advertising, software, phone systems, or insurance' and 'is most significant if it reveals that the worker performs a specialized service that requires a tool or application which he has mastered.'" *Gilbo v. Agment, LLC*, 831 F. App'x 772, 776 (6th Cir. 2020) (quoting *Keller*, 781 F.3d at 810). As the Sixth Circuit has explained:

> When considering the worker's capital investment in the equipment needed to perform his job, we must consider those investments in light of the broader question: whether that capital investment is evidence of economic independence. Accordingly, there are inherently some capital investments that do not necessarily evidence economic independence. For example, "investment of a vehicle is no small matter, [but] that investment is somewhat diluted when one considers that the vehicle is also used by most drivers for personal purposes." *Herman v. Express Sixty–Minutes Delivery Serv., Inc.*, 161 F.3d 299, 304 (5th Cir.1998). On the other hand, investment in something like welding equipment signals a greater degree of economic independence because it is not a common item that most people use daily. *See id.*; *see also Scantland*, 721 F.3d at 1317–18 ("[I]n light of the fact that most technicians will already own a vehicle suitable for the work and that many technicians purchased specialty tools from Knight directly via payroll withholdings, there seems to be little need for significant independent capital and very little difference from an employee's wages being increased in order to pay for tools and equipment."). The same logic also applies to computer equipment and basic hand tools—tools many people have for personal use.

*Keller*, 781 F.3d 799, 810-11.

It is undisputed that for each job site, Defendants provide drywall, mud, tape, screws, metal studs, cement board, ceiling tiles, EIFS supplies, scissor lifts, boom lifts, forklifts, and scaffolds. (Doc. 36, ¶¶ 34-35).  Huber testified that Defendants also supply tools such as chop saws, hammer drills, T-3 guns, and grinders. (Doc. 44-2, Michael Huber Dep. at 27-28, PAGEID 4974-4975).  Huber explained that subcontractors must supply their own hand tools, such as tape measures, squares, snips or chalk lines.  (Doc. 44-2, Huber Dep. at 28-29, PAGEID # 4975-976).  However, Wethington testified that when he worked as a foreman for G.E.M., the Subcontractors provided all the necessary tools themselves.  (Doc. 43, Wethington Dep. at 39, PAGEID 1299).  Wethington explained that if the Subcontractors did not have some of the more expensive tools, he would let them use the tools owned by G.E.M.  (Doc. 43, Wethington Dep. at 39, PAGEID 1300).

For the most part, no specialized equipment is needed to perform the construction work done by Defendants.  Therefore, the equipment itself does not signal a greater degree of economic independence on the part of the Subcontractors.  While some of the equipment was more expensive—which might be an indicator of capital investment—there is some discrepancy in the record regarding who provided tools such as chop saws, hammer drills, T-3 guns and grinders.  Moreover, there is nothing in the record regarding the costs of the tools supplied by the Subcontractors versus those which may have been provided by Defendants.  Similarly, the parties have not pointed to evidence in the record regarding a Subcontractor's capital investment relative to the materials which were undisputedly supplied by Defendants.  Therefore, this factor does not support either side's

contention that there is an absence of a genuine issue as to the Subcontractors' employment status.

### d. Opportunity for profit or loss

This factor asks whether the workers had an opportunity for greater profits based on their management and technical skills. *Keller*, 781 F.3d at 812 (citing *Brandel*, 736 F.2d at 1119). "Courts evaluate this factor by asking if workers 'could exercise or hone their managerial skill to increase their pay.'" *Off Duty Police Servs. Inc.*, 915 F.3d at 1059 (quoting *Schultz v. Cap. Int'l Sec., Inc.*, 466 F.3d 298, 307 (4th Cir. 2006)). If a worker uses his managerial skill to "improve his efficiency such that he c[an] complete more" jobs per day, this factor may weigh in favor of independent contractor status. *Id*. (quoting *Keller*, 781 F.3d at 813). However, the ability to accept or reject work does not reflect the use of a managerial skill. *Off Duty Police Servs. Inc.*, 915 F.3d at 1059 ("It requires little skill to determine whether one is available at a certain day and time or whether inclement weather or some other factor might make a job less desirable."). While the ability to control one's schedule may, in some circumstances, allow more efficient workers to maximize profits, if workers must be present for set periods of time, the workers cannot complete jobs more or less efficiently in order to perform additional paid work. *Id*.

The Secretary argues that Subcontractors did not have an opportunity for profit and loss because Defendants told Subcontractors the number of workers to provide, and when to start and stop work. However, the Court notes that the record is not clear on this point. Massie testified that when he would hire Subcontractors, he would first get quotes from them:

26

I have a plan room with all my drawings, jobs we've been awarded. They come in and they look at the drawings that are available but not yet started, though. They give me a price based on that.

(Doc. 38, Massie Dep. at 59, PAGEID 233). Massie explained that he then negotiates the price with the Subcontractors:

Q: Do you negotiate with subs?

A: Yes.

Q: Do you decide how much they're going to get paid?

A: No.

Q: Who does?

A: It's in their proposal. They -- they -- they tell me what they want.

Q: Are these written proposals?

A: Mostly verbal. Once -- once they are approved, I put them in a -- in a contract form.

Q: Do you always put that down in a contract?

A: Yes.

Q: For all subs?

A: Yes.

Q: Okay. That's after they've been hired to work as a sub?

A: Once we negotiated the price.

(Doc. 38, Massie Dep. at 22, PAGEID 196). Massie testified that the price can be based on either a flat fee or a price per hour for the work:

Q: When the subcontractors -- when they're negotiating with you before they've entered into the subcontractor form, what is it that they offer to you? Do they say ten guys at $20 an hour, or do they just give you a flat hourly rate and they decide how many guys to bring on? Explain that process to me.

A: I give them a set of drawings. I have them read the drawings. I give them a schedule for the job. They essentially tell me yes or no, they can't handle the job, they could take on the job, if they're busy or not. Then they give me their price, and we negotiate that price.

Q: And how is that price broken down? Is that a flat hourly rate per manhour or is it for each different worker?

A: It's a flat fee or a price per hour.

Q: When you say "flat fee," is that the same thing as piece rate, like per linear foot of drywall?

A: No.

Q: Okay.

A: A grand total for the entire job.

(Doc. 38, Massie Dep. at 24, PAGEID 198). However, Defendant Lisa Pack, who serves as office manager for G.E.M., testified that since 2017, Defendants have primarily paid Subcontractors based on an hourly rate instead of a piece rate. (Doc. 44-3, Lisa Pack Dep. at 40-41, PAGEID 5093-5094). Massie explained that these hourly rates are all "pretty well the same" because "[e]veryone knows what it takes." (Doc. 38, Massie Dep. at 61, PAGEID 235). Massie explained that even though he might know a Subcontractor's hourly rate, he does not know how many workers will end up working on the job:

Q: Okay. So how do you know if they are going to have enough manpower out on the field for those jobs?

A: They would tell me. They wouldn't bid a job unless they had the manpower.

(Doc. 38, Massie Dep. at 61-62, PAGEID 236-237). Massie then decides which Subcontractor to use based on who gives him the lowest price. (Doc. 38, Massie Dep. at 61, PAGEID 235). Once the Subcontractors begin work, they get paid by submitting an

invoice each week. (Doc. 44-3, Lisa Pack Dep. 46, PAGEID 5099). The invoice will include the job name; the number of hours or the number of linear feet of drywall installed; the rate of pay per hour or per feet installed; and the total amount due. (Id.)

Therefore, there is evidence in the record that Subcontractors are able to negotiate their rate of pay. While there is some discrepancy as to who decides how many workers are needed on a job,[4] that fact is largely irrelevant in the profit calculation because the rate of pay is usually calculated as a per hour cost. Because the work is time orientated, and not project oriented, there is little opportunity for Subcontractors to increase their income other than by working more hours. This means that Subcontractors are not able to "exercise or hone" their managerial skills to increase their pay because they earn a set hourly wage regardless of the skill they exercise. *See Off Duty Police Servs.*, 915 F.3d at 1059.

Conversely, there is little opportunity for the Subcontractors to lose money either. *Accord Acosta v. Peregrino*, No. 3:17-CV-01381, 2020 WL 5995049, at *10 (M.D. Tenn. Oct. 9, 2020) ("Aside from perhaps not completing a project, losing time working on a project, or not making enough to cover their expenses owed to Defendants (for living, transportation, and tools), there is no real opportunity for the workers to lose money in their ventures laying and finishing drywall.") (citing *Perez v. Howes*, 7 F. Supp. 3d 715, 725 (W.D. Mich. 2014), *aff'd sub nom. Perez v. D. Howes, LLC*, 790 F.3d 681 (6th Cir. 2015) (finding no opportunity for loss when the only investment of the workers was time and travel)). As the Sixth Circuit has explained: "Decreased pay from working fewer hours

---

[4]Roger East, a G.E.M. foreman, testified that it was the foreman who decided how many workers were needed at the jobsite. (Doc. 40, Roger East Dep. 24, PAGEID 613). However, another G.E.M. foreman testified that it was "[t]he people -- our contractors, they dictate how many men we need." (Doc. 44-2, Michael Huber Dep. 23, PAGEID 4970).

does not qualify as a loss." *Off Duty Police*, 915 F.3d at 1059 (citing *Dole v. Snell*, 875 F.2d 802, 810 (10th Cir. 1989) ("A reduction in money earned by the [cake] decorators is not a 'loss' sufficient to satisfy the criteria for independent contractor status.")).

Therefore, this factor does support the Secretary's contention that there is an absence of a genuine issue as to the Subcontractors' employment status.

### e. Right to control

This factor considers the degree of control exercised by the company over the workers. *Off Duty Police Services*, 915 F.3d at 1060. "To guide this evaluation, [the court] ask[s] whether the company 'retains the right to dictate the manner' of the worker's performance." *Id*. (quoting *Brandel*, 736 F.2d at 1119). However, "'[t]he absence of need to control should not be confused with the absence of right to control,' and the actual exercise of control 'requires only such supervision as the nature of the work requires.'" *Id*. at 1061 (quoting *Peno Trucking, Inc. v. Comm'r of Internal Revenue*, 296 F. App'x 449, 456 (6th Cir. 2008)). Indicators of a defendant's level of control include control over scheduling, the ability to take on other contracts, ability to discipline, and overall supervision of the worker's work product. *Acosta v. Peregrino*, No. 3:17-CV-01381, 2020 WL 5995049, at *10 (M.D. Tenn. Oct. 9, 2020) (citing *Keller*, 781 F.3d at 814-15; *Brandel*, 736 F.2d 1119).

G.E.M. foreman Steve Michael explained: "As a foreman I supervised a crew of workers, which included G.E.M. employees and workers that G.E.M. considered subcontractors." (Doc. 47-1, Steve Michael Decl., at 1, ¶ 3). There is evidence that on a jobsite, Defendants do not have complete control of the schedule or hours of work because the general contractor determines the sequence of work. (Doc. 43, Wethington

Dep. at 50-51, PAGEID 1311-1312). The superintendent for the general contractor creates the field schedule, which is then shared with the G.E.M. foreman. (Doc. 43, Wethington Dep. at 51, PAGEID 1312). Subcontractors do not have access to the field schedule. (Doc. 43, Wethington Dep. at 51, PAGEID 1312). The G.E.M. foreman uses the field schedule to tell the crew of workers where to start work. (Doc. 43, Wethington Dep. at 50-51, PAGEID 1311-1312). As Michael Huber, a G.E.M. foreman, explained in his deposition:

> Q: For your crew, do you decide who is going to do what work?
>
> A: Yes.
>
> Q: Okay. So, for instance, you'll say, you know, you three go do this, you three go do this?
>
> A: Yes, every day.
>
> Q: And that includes the subcontractor workers, right?
>
> A: Yeah. That's who my crew is.

(Doc. 44-2, Huber Dep. 44, PAGEID 4991). The G.E.M. foreman also determines break times. As Huber explained:

> Q: Does everyone take a break at the same time on your crew?
>
> A: Yeah.
>
> Q: Are you the person who says, okay, time for a break?
>
> A: Yes.
>
> Q: And the same for lunch?
>
> A Yeah.

(Doc. 44-2, Huber Dep. at 44, PAGEID 4991). William Sharp, another G.E.M. foreman, testified similarly:

Q: Is there a typical schedule that general contractors set --

A: No.

Q: -- or does it vary? And do the workers also take breaks?

A: No, they don't take a break. They prefer to take a long lunch.

Q: How long of a lunch do they take?

A: Forty-five minutes.

Q: Do the workers need your permission to take their lunch break?

A: No. I mean, we normally all go at the same time.

Q: Are you the one who decides, like, now is the time for the lunch break?

A: I'd say that's fair to say that, yeah.

Q: And when you say you all go at the same time, does that include the G.E.M. subcontractors and their workers?

A: Yes.

(Doc. 44-4, William Sharp Dep. at 54, PAGEID 5305). However, the general contractor usually determined when the jobsite would open and close (Doc. 41, Tracey Barger Dep. at 16, PAGEID 784), and if work could be done on the weekends. (Doc. 43, Wethington Dep. at 106-107, PAGEID 1367-1368). On some occasions, Subcontractors would arrive earlier to work or stay later than the G.E.M. foreman. (Doc. 41, Tracey Barger Dep. at 38-39, PAGEID 806-807).

Defendants maintain that their supervision on G.E.M. jobsites is only for quality control and billing purposes.[5] In his deposition, Ben Wethington confirmed that G.E.M.

---

[5]The Court notes that while the general contractor ultimately bore responsibility for workplace safety, some of the contracts between G.E.M. and the general contractor required G.E.M. to provide "OSHA competent supervision" of its own subcontractors. (Doc. 38, Massie Dep. at 84, PAGEID 258).

foreman usually kept track of the Subcontractors' time if the work was being billed on an hourly rate:

> Q: When you sent workers to a job site as Assured, would they be supervised by the G.E.M. foreman on the job?
>
> A: If it was hourly, yes. If it was piece work, they pretty much would do the same thing that I always did. They would point them in the direction that needed done and then they would rock out.
>
> Q: And when you say they, you're talking about the G.E.M. foreman?
>
> A: Yes.
>
> Q: But if G.E.M. was paying Assured hourly, then they would be supervised by the foreman?
>
> A: Yes. The foreman would tell them what they were wanting done.
>
> Q: Would the G.E.M. foreman keep track of the Assured workers hours worked?
>
> A: Most of the time, yeah.
>
> Q: Because you needed to know that in order to pay your people, right?
>
> A: Well, my people would turn in time to me and then I would bill for it, so they would have to keep some sort of record or I could just bill for whatever I wanted.
>
> Q: You're saying the G.E.M. foreman would have to keep some sort of record?
>
> A: Yes.
>
> Q: Do you know if they did?
>
> A: I would say some of them did. Some of their foremen are not very intelligent in my opinion.

(Doc. 43, Wethington Dep. at 91-92, PAGEID 1352-1353). The G.E.M. foremen often recorded the Subcontractors' hours on the same timesheet as the G.E.M. employees.

(Doc. 43, Wethington Dep. at 25, PAGEID 1286; Doc. 41, Barger Dep. at 37-38, PAGEID

805-806). However, the G.E.M. foremen kept no other employment records other than these timesheets. (Doc. 40, Roger East Dep. at 50, PAGEID 639).

Wethington also testified that the G.E.M. foremen keep an eye on the quality of work:

> Q: If the G.E.M. foreman had an issue with one of the Assured workers, what would they do?
>
> A: Call me.
>
> Q: And then what would you do?
>
> A: Either fix the problem or remove them from the job.
>
> Q: Did a G.E.M. foreman ever remove any of your Assured workers from the job?
>
> A: I'm sure they've told them to go home for lack of hard hats or lack of quality or just not performing properly.
>
> Q: Okay. And when you say you're sure that's happened, do you know that that's happened?
>
> A: Yeah.

(Doc. 43, Wethington Dep. at 92-93, PAGEID 1353-1354). Similarly, Tracey Barger testified that when she was working as G.E.M. foreman, and wanted to fire a Subcontractor:

> . . I would call, for example, if I had one of Orlando's guys, I would contact Orlando and tell him I don't want him back, or you need to make him leave my job now. If it was one of Assured Construction, I would call Ben, say, I don't want this guy back, or you need to make him leave now.
>
> Q: Okay. And you've done that?
>
> A: I have.

(Doc. 41, Tracey Barger Dep. 37, PAGEID 805). Yet, while there is no dispute that Defendants could ask a Subcontractor to remove a particular worker from a jobsite,

34

Wethington testified that G.E.M. did not have the right to hire or fire workers on behalf of his company:

> Q: Did G.E.M. Interiors have the right to hire workers on behalf of Assured Construction?
>
> A: No.
>
> Q: Did G.E.M. Interiors have the right to fire your workers?
>
> A: No.
>
>  . . .
>
> Q: Did G.E.M. Interiors tell you if you had to have particular workers on their job sites versus if you were running a job site for say Benco at the same time?
>
> A: No.
>
> Q: Was that your job to decide where people would go?
>
> A: Yes. Like any company, some people are better than others, so if you could send them better ones they prefer that.

(Doc. 43, Wethington Dep. 302-303, PAGEID 1562-1563).  Wethington also testified that Defendants did not have any control over how much he paid his workers, or other subcontractors he would hire through Assured Construction:

> Q: Okay. You had just recently testified that Luis Rosas was one of the subcontractors that Assured would hire that had multiple workers under their umbrella, correct?
>
> A: Correct.
>
> Q: Okay. Who determined how much Luis Rosas paid those workers?
>
> A: Luis Rosas.
>
> Q: Did Assured Construction have anything to do with that?
>
> A: No.

Q: Did G.E.M. Interiors?

 A: No.

(Doc. 43, Wethington Dep. at 302-303, PAGEID 1562-1563).

The Secretary maintains that even if Defendants could somehow argue they do not "directly" supervise Subcontractors, there is enough evidence showing that Defendants exercise indirect control over workers.  However, the Court notes that while there are instances where Defendants' supervision of the Subcontractors' work for billing and quality purposes is indistinguishable from the control they exerted over their own employees, there is conflicting evidence regarding Defendants' right to hire and fire Subcontractors.  There is also conflicting evidence as to who determines the daily work schedule.  While G.E.M. foremen testified that they set the daily work schedule, there is also evidence that in some instances, the schedule was dictated by the general contractor's rules regarding when the jobsite was open or closed for work.  There was no evidence explaining what would happen if a Subcontractor was late or did not show up. The record indicates that for the most part, Defendants had no idea how many workers would show up or who they would be.  Moreover, beyond recording the hours worked, Defendants had no record of who was working on the jobsite.

Therefore, this factor does not support either side's contention that there is an absence of a genuine issue as to the Subcontractors' employment status.

### f.   Integral part of the business

This factor considers how integral the workers were to the alleged employer's business. *Off Duty Police Services*, 915 F.3d at 1055. "The more integral the worker's

services are to the business, then the more likely it is that the parties have an employer-employee relationship." *Id.* (quoting *Keller*, 781 F.3d at 815).

As one district court observed in a case involving a drywall company:

It is not disputed that the jobs the laborers perform are integral to Defendants' business.  Defendants are, after all, in the business of installing drywall.  This factor turns on whether the service the worker performs is integral to the business, not on whether a worker is individually integral, *Montoya*, 589 F.Supp.2d at 581.  Laborers are scheduled to do work on a sequential basis: sheetrock is installed after insulation, taping is done after the sheetrock is installed, patchwork happens later, and so forth.  *See, e.g. Baker*, 137 F.3d at 1443 (welder's work is important, indeed integral, to pipeline construction work); *Crowd Mgmt. Servs.*, 1994 WL 481183, at *2 (furnishing workers to provide security integral to crowd control).  These are all necessary components of Defendants' business, thus this factor weighs in favor of employee status.

*Chao v. Westside Drywall, Inc.*, 709 F. Supp. 2d 1037, 1065 (D. Or. 2010), *as amended* (May 13, 2010).  The Court sees no distinction here.  One of the services provided by Defendants' business is commercial drywall installation. Moreover, there is evidence in the record that G.E.M.'s employees and the Subcontractors perform that same work, often side-by-side.  (Doc. 43, Wethington Dep. at 42-43, PAGEID 1303-1304).

Therefore, this factor does support the Secretary's contention that there is an absence of a genuine issue as to the Subcontractors' employment status.

### g.  Summary of "economic reality" test factors

Conflicting inferences can be drawn from the facts supporting the parties' respective positions regarding the application of the economic reality test factors.  The Court concludes that there is sufficient evidence for reasonable jurors to differ as to whether the Subcontractors were properly classified as Defendants' employees or

independent contractors.[6]   Therefore, neither party has established entitlement to judgment as a matter of law on this question.

Alternatively, the Secretary has argued that G.E.M. should be considered the Subcontractors'' joint employer; and in that capacity be found liable for those workers' overtime wages.   However, as Defendants point out, the Secretary did not pursue any claim of joint employer liability in the Complaint; did not make any argument regarding joint employer liability in his Motion for Summary Judgment; and expressly disclaimed this theory during discovery (See Doc. 65-1).   "Generally, a plaintiff cannot raise a claim for the first time at the summary judgment stage."   *Alomari v. Ohio Dep't of Pub. Safety*, 626 F. App'x 558, 566 (6th Cir. 2015) (citing *Carter v. Ford Motor Co*., 561 F.3d 562, 568 (6th Cir. 2009)).   To permit a plaintiff to do otherwise would subject defendants to unfair surprise.   *Tucker v. Union of Needletrades, Indus. & Textile Emps*., 407 F.3d 784, 788 (6th Cir. 2005) (citing *Guiffre v. Local Lodge No. 1124*, No. 90–3540, 1991 WL 135576, at *5 (6th Cir. July 24, 1991) (unpublished) (refusing to hear claims raised for the first time in opposition to summary judgment because, "[h]aving received no notice of them, the defendants had no opportunity to investigate them when they conducted their own discovery").

In summary, Defendants and the Secretary are not entitled to summary judgment on the issue of whether Defendants misclassified workers under the FLSA as independent contractors instead of employees.

---

[6]Defendants argue that the Secretary cannot lump any number of companies or individuals together as "Labor Providers;" but instead must present specific proof for each Subcontractor and each worker's relationship with G.E.M.  However, Defendants have not shown that the individual Subcontractor's situations vary to such a degree that consideration of each individual circumstance is required. *Accord Crouch v. Guardian Angel Nursing, Inc*., Case No. 3:07-CV-00541, 2009 WL 3737887, at *14 (M.D. Tenn. Nov. 4, 2009).

**2. Overtime wages owed to employees**

The Secretary claims that in addition to misclassifying workers as independent contractors, Defendants also implemented schemes to avoid paying overtime wages to workers they admit are G.E.M.'s employees.

"Under the Fair Labor Standards Act ..., employers must pay their employees ... overtime for hours worked in excess of forty in a workweek." *Misewicz v. City of Memphis, Tenn.*, 771 F.3d 332, 333-34 (6th Cir. 2014) (citing 29 U.S.C. § 207(a)(1)).  Based on his investigation conducted in April of 2015, the Secretary has identified thirty-five separate instances where the Secretary maintains that G.E.M.'s time records show a G.E.M. employee worked more than forty hours in a pay period, but the corresponding pay records show G.E.M. did not pay premium overtime wages for all overtime hours worked. (See Doc. 50-1).[7]  The Secretary explains that during the investigation, he discovered that G.E.M. pays employees straight time for overtime, or will give employees additional time off for overtime hours worked. (Doc. 46-1, Bogomolov Dec., ¶ 4).  The Secretary states that original timesheets maintained by Steven Michael, a former G.E.M. foreman, shows that employees worked overtime hours for which G.E.M. failed to pay them; and accuses G.E.M. of producing false timesheets that make it appear as if employees worked fewer overtime hours than they actually worked.  (Doc. 46-1, Bogomolov Dec., ¶ 9).  The Secretary also relies on text messages from Michael's phone to show that G.E.M. banked employees' overtime hours for later payment, rather than paying them in cash. (Doc. 47-1, Michael Decl. ¶¶ 9-13, PAGEID 390-392, 396, 399, 401).

---

[7]This sample only shows unpaid overtime hours for employees Nolan Buck, Steve Michael, Juan Alvarado and Bill Sharp.  However, the Secretary has provided a list of current and former employees which he claims are owed wages.  This list appears in in Schedule A, which is attached to the Amended Complaint.  (Doc. 1-1).

Defendants insist that if a G.E.M. employee works overtime, they are paid time and a half.  (Doc. 44-3, Lisa Pack Dep. at 71, PAGEID 5124; Doc. 53-1, Lisa Pack Decl., ¶ 2, PAGEID 6010-12).   One of these employees, William Sharp, testified that he was paid time and a half for overtime hours.  (Doc. 44-4, William Sharp Dep. at 84, PAGEID 5335).   However, the Secretary has included Sharp as part of the thirty-five separate instances where G.E.M.'s time records show that Defendants did not pay premium overtime wages for all overtime hours worked.  (Doc. 50-1, PAGEID 5945).

Defendants deny altering any records.  (Doc. 44-3, Lisa Pack Dep. at 147, PAGEID 5200).  Defendants explain that the discrepancies in the time sheets produced by Michael could have been because he called his time in and then later turned in a timecard with additional time.  (Doc. 44-3, Lisa Pack Dep. at 148, PAGEID 5201).  Defendants also point to testimony of its employees that G.E.M. does not engage in any "banking overtime hours."  (Doc. 44-2, Michael Huber Dep. at 59, PAGEID 5006; Doc. 39, James Borgerding Dep. at 59-60, PAGEID  533-34; Doc. 40, Roger East Dep. at 61, PAGEID 650).

The Secretary explains that during his investigation he also discovered that in some instances, G.E.M. employees would work overtime, but G.E.M. paid for these hours, at employees' normal rate of pay, through a side "reimbursement" check from G.E.M.  (Doc. 46-1, Bogomolov Decl., ¶ 12).  However, the Secretary noted that these instances all occurred before March 27, 2014.  (Id.)  Defendants respond that G.E.M. does not pay overtime as a reimbursement.  (Doc. 44-3, Lisa Pack Dep. at 73, PAGEID 5126).  Defendants rely on the testimony of G.E.M. employees who stated that they did not receive overtime as a "reimbursement," but would instead be reimbursed for business

expenses.   For example, James Borgerding, who worked as both a carpenter and foreman for G.E.M. testified:

> Q: Do you ever get reimbursed by G.E.M. for anything?
>
> A: If I go and buy gas or something like that, I'll keep the receipts and turn them in on the time sheets, and they'll reimburse me through my check on that.
>
> Q: What does that mean, you get reimbursed on the time sheet -- or you put it on the time sheet?
>
> A I'll turn it in with the time sheet and let Lisa know that I had to buy $30 in fuel, and I'll send her the copy of the receipt. And then I guess it comes back reimbursed, I guess. So I think they write it on there, reimbursed, $30, blah, blah, blah. Fuel or whatever.
>
> Q: Are you sending a picture of the receipt?
>
> A: Yeah.
>
> Q: By text message?
>
> A: That and writing it on the time sheet, yeah.
>
> Q: And how do you get paid for that?
>
> A: It will just be on my check. Just says reimbursed.
>
> Q: It's on your direct deposit?
>
> A: Yeah.

 (Doc. 39 James Borgerding Dep. at 57-58, PAGEID 531-532).

As further evidence that Defendants did not pay employees for overtime, the Secretary notes that G.E.M. requested extra payments from its general contractors for employee overtime hours that did not appear on the timesheets G.E.M. produced to the Department of Labor.  (Doc. 44-1, G.E.M. Dep. at 168-169, PAGEID 4914; Doc. 44-3, Pack Dep. at 154-55, PAGEID 5207-5208; Doc. 50-2; Doc. 50-3).  Defendants respond

that overtime requested by G.E.M. from a general contractor in a change order or extra ticket is not overtime pursuant to the FLSA, but is work paid at a premium because it is outside the scope of the original contract. (Doc. 44-1, GEM Dep. at 168-169, PAGEID 4914-4915).

Finally, the Secretary claims that Defendants pay employees for overtime hours – at the straight time rate – with a separate check from a different legal entity: Assured Construction Services, LLC. The Secretary explains that the Summary of Samples of Overtime Wages Paid by Side Check, shows that G.E.M. paid some employees for a flat forty hours via a G.E.M. paycheck; but other records show these same G.E.M. employees also received checks from Assured for work done during the exact same workweeks and at the exact same straight time rate. (Doc. 50-4).

Defendants dispute that G.E.M. pays its employees overtime through separate checks. Defendants maintain that G.E.M. ended any practice of paying overtime in a separate check after "getting in trouble" with the Department of Labor, *i.e.*, the 2011 Investigation. (Doc. 44-4, William Sharp Dep. at 85, PAGEID 5336). Defendants explain that since at least 2011, G.E.M. also does not pay employee wages through any other entity, including Assured Construction, Inc. (Doc. 44-4, William Sharp Dep., at 86, PAGEID 5337). Defendants explain that on occasion, Assured recruited G.E.M. employees for extra work on nights and weekends. (Doc. 43, Ben Wethington Dep. at 140, PAGEID 1401). Wethington testified that he would hire "[a]nybody that wanted extra money" to work for Assured. (Doc. 43, Ben Wethington Dep. at 141, PAGEID 1402). Defendants maintain that even though Assured was hiring G.E.M. employees to work on

G.E.M. jobs after hours, this was not work for G.E.M. because the work day for G.E.M. had ended.  (Doc. 43, Ben Wethington Dep. at 164, PAGEID 1425).

In analyzing whether a genuine issue of dispute of fact exists, this Court does not judge credibility or weigh conflicting evidence; but must instead believe the evidence of the nonmoving party, and draw "all justifiable inferences" in his favor.  *Briggs v. Univ. of Cincinnati*, No. 20-4133, 2021 WL 3782657, at *4 (6th Cir. Aug. 26, 2021) (quoting *Anderson*, 477 U.S. at 255).  The testimony and evidence demonstrate there is a genuine issue of material fact as to whether Defendants have paid employees straight time for overtime; whether payments were made through Assured for hours worked for Defendants; and whether Defendants have given employees additional time off for overtime hours worked.  Because this issue can be resolved only by assessing the credibility of the witnesses and by weighing the evidence, it must be decided by this Court as the trier of fact at a bench trial and not on a motion for summary judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).  Therefore, the Secretary is not entitled to summary judgment on this issue. Accordingly, the Secretary's Motion for Summary Judgment is DENIED with respect to the Secretary's claim that Defendants violated the FLSA by failing to pay overtime wages to workers they admit are G.E.M.'s employees.

### 3.  Recordkeeping

The FLSA requires employers to keep records documenting the hours that each employee works daily and weekly.  29 U.S.C. § 211(c); 29 C.F.R. § 516.2.[8]  The Secretary

---

[8]An employer is required maintain payroll or other records which contain certain information and data regarding each employee, including: "the time of day and day of week on which the employee's workweek begins," "hourly rate of pay for any workweek in which overtime compensation is due," "the monetary amount paid on a per hour, per day, [or] per week ...

claims that Defendants have violated these recordkeeping provisions with respect to their admitted employees and Subcontractors. Specifically, the Secretary explains that Defendants' use of separate checks for overtime and "banking" of overtime hours violates recordkeeping requirements. The Secretary claims that from March 27, 2014 to the present, Defendants have failed to create and maintain complete records of hours worked by employees. (Doc. 46-1, Bogomolov Decl., ¶¶ 7-11). The Secretary also claims that Defendants maintained false records of hours worked and wages paid to their employees. (Doc. 46-1, Bogomolov Decl., ¶¶ 8-9).

As the Sixth Circuit has explained, while a plaintiff generally has the burden of proving that his employer violated the FLSA:

> where the employer's records are inaccurate or inadequate ... an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence.

*Herman v. Palo Grp. Foster Home, Inc.*, 183 F.3d 468, 472 (6th Cir. 1999) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946)).

Defendants explain that the sole evidence regarding any alleged "false" timesheets is from Steve Michael. Defendant Pack testified that those records may not be accurate and could have been made up after Michael submitted his time for payroll. (Doc. 44-3, Lisa Pack Dep. at 145-147, PAGEID 5198-5200). Pack also testified that she did not alter

---

basis," the "hours worked each workday and total hours worked each workweek," "total daily or weekly straight-time earnings or wages due for hours worked ... exclusive of premium overtime compensation" and "total premium pay for overtime hours." 29 C.F.R. § 516.2(a).

these records. (Doc. 44-3, Lisa Pack Dep. at 147, PAGEID 5200). In addition, Defendants also point to records which show that G.E.M. paid its employees 1692.75 hours of overtime in 2014, 2,939.50 hours of overtime in 2015, and 1,153 hours of overtime in 2016. (Doc. 53-1, Decl. of L. Pack, ¶ 1, PAGEID 6009-6012).

As the Court explained above, there is conflicting evidence as to whether Defendants paid employees for overtime hours worked; whether Defendants "banked" employee overtime hours; and whether Defendants paid employee overtime hours in separate checks through Assured or any other independent contractor. These disputed issues create a genuine issue of material fact as to whether Defendants have complied with the FLSA recordkeeping provisions.

Therefore, the Secretary is not entitled to summary judgment on this issue. Accordingly, the Secretary's Motion for Summary Judgment is DENIED with respect to the Secretary's claim that Defendants violated the FLSA's recordkeeping requirements.

### 4. Willfulness and liquidated damages

The Secretary argues that given Defendants' prior history of violating the FLSA, this Court should find that Defendants' violations are willful.

As the Sixth Circuit has explained, "if an employer 'willfully' violates the FLSA, the statute of limitations is three years. If the violation is not willful, the limitations period is two years." *Herman v. Palo Grp. Foster Home, Inc.*, 183 F.3d 468, 473-74 (6th Cir. 1999). Violations are willful if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Id.* (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985). In addition, under the FLSA, the Secretary is permitted:

to recover liquidated damages up to the amount of the unpaid overtime—
what amounts to a possibility of double damages. 29 U.S.C. § 216(c).  In
the words of the statute: "The Secretary may ... recover ... an equal amount
as liquidated damages," *id*.; if, however, "the employer shows to the
satisfaction of the court that the act or omission ... was in good faith and
that he had reasonable grounds for believing that his act or omission was
not a violation of the [Act], the court may, in its sound discretion, award no
liquidated damages," *id*. § 260.

*Acosta v. Min & Kim, Inc*., 919 F.3d 361, 366 (6th Cir. 2019).

However, the Court need not reach either of these issues absent a determination

of liability.  *See Regan v. City of Charleston, S.C.*, 131 F. Supp. 3d 541, 558 (D.S.C. 2015)

(citing *Longlois v. Stratasys, Inc*., 88 F.Supp.3d 1058, 1080 (D.Minn. 2015) ("With

[defendant's] liability still an open question ... consideration of two of those issues—

relating to the statute of limitations and liquidated damages—must be deferred."); *Kelley*

*v. TaxPrep1, Inc*., Case No. 5:13-CV-451, 2015 WL 4488401, at *3 (M.D.Fla. July 22,

2015) ("[T]he court cannot make a determination on the issue of willfulness until it is first

determined that a violation of the FLSA actually occurred."); *id*. ("Again, because no FLSA

violation has been established (or otherwise conceded), consideration of the issue of

liquidated damages, and thus the associated affirmative defense of good faith, is

premature."); *Switzer v. Wachovia Corp*., No. CIV.A. H–11–1604, 2012 WL 3685978, at

*5 (S.D.Tex. Aug. 24, 2012) ("Absent a violation of the FLSA, there can be no willful

violation."); *Cusumano v. Maquipan Int'l, Inc*., 390 F.Supp.2d 1216, 1223 (M.D.Fla. 2005)

("In the absence of a determination of an FLSA violation, consideration of the issue of

liquidated damages, and thus the associated affirmative defense of good faith, is

premature.")).  Therefore, the Secretary's Motion for Summary Judgment on the issues

of willfulness and liquidated damages is DENIED as premature because Defendants'

violation of the FLSA is yet to be determined.

### 5. Joint and Several liability

The Secretary argues that Defendants Massie, Hayes, and Pack are employers under Section 203(d) of the FLSA and, therefore, are jointly and severally liable for any FLSA violations found by the Court.

Under the FLSA, an employer includes "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). "The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." *Donovan v. Agnew*, 712 F.2d 1509, 1511 (1st Cir. 1983) (citing cases). Accordingly, the Sixth Circuit has held that an individual who has a significant ownership interest in the corporation, and controlled significant day-to-day functions of the business, including determining salaries, can be held personally liable under the FLSA. *Fegley v. Higgins*, 19 F.3d 1126, 1131 (6th Cir. 1994) (citing *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962 (6th Cir. 1991)).

The Secretary argues that Massie, Hayes, and Pack are owners and officers with operational control because they set pay rates and the terms and conditions of employment for admitted employees and Subcontractors; and they oversee G.E.M.'s daily operations.

Defendants respond that there is no evidence that Massie had any direct supervision of G.E.M. employees; but he could in some instances, hire or fire employees. Defendants acknowledge that Massie negotiated contracts with Subcontractors, but argue that these facts alone are not dispositive to his personal liability. As to Hayes, Defendants point out that Hays has not been employed by G.E.M. since June 7, 2019,

and any day-to-day operational control she may have had ceased when her employment ended.  Defendants maintain that because her ownership interest is not "significant," and she no longer exercises control over day-to-day functions, Hays does not qualify as an "employer" under the FLSA.  Similarly, Defendants argue that Pack only holds a minority interest (5%) in shares in G.E.M.  In addition, Defendants explain that in her role as office manager, Pack's responsibilities include payroll, bookkeeping, taking time cards, entering invoices for accounts payable, and accounts receivable; but she does not supervise anyone, cannot hire or fire anyone, and does not set wages for any employees. (Doc. 44-3, Lisa Pack Dep. at 11-12, PAGEID 5064-5065).

The Court concludes there are genuine issues of material fact regarding whether Massie, Hayes, and Pack are employers under Section 203(d) of the FLSA.  Therefore, the Secretary is not entitled to summary judgment on this issue.   Accordingly, the Secretary's Motion for Summary Judgment is DENIED with respect to whether Defendants Massie, Hayes, and Pack are jointly and severally liable for any FLSA violations found by the Court.

### III.    CONCLUSION

Based on the forgoing, it is hereby **ORDERED** that:

1.    Defendants' Motion for Summary Judgment (Doc. 45) is **DENIED**;

2.    Plaintiff's Motion for Summary Judgment (Doc. 49) is **DENIED**;

3.    Defendants' Motion to Strike the Declaration of Steve Michael (Doc. 54) is **OVERRULED in PART and SUSTAINED in PART**;

4.    Defendants' Motion to Strike Declaration and Exhibit of Wage and Hour Division Investigator Nikolai Bogomolov (Doc. 55) is **OVERRULED in PART and SUSTAINED in PART**; and

5.      Defendants' Motion to Strike the Declarations of Unidentified Employee Witnesses (Doc. 63) is **OVERRULED as MOOT**.

**IT IS SO ORDERED**.

*/s/ Michael R. Barrett*
Judge Michael R. Barrett
United States District Court